**John W. SYPOSS, Jr. and Carol Syposs, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

**In re Children's Hospital of Buffalo; Erie County Medical Center and Sisters of Charity Hospital, non-parties subpoenaed pursuant to Fed.R.Civ.P. 45,**

**No. 97–CV–572S F.**

United States District Court, W.D. New York.

Aug. 31, 1999.

Jasen, Jasen & Sampson, P.C., Hon. Matthew J. Jasen, William E. Nowakowski, of counsel, Buffalo, New York, for plaintiffs.

Denise E. O'Donnell, United States Attorney, Lynn S. Edelman, Assistant United States Attorney, of counsel, Buffalo, New York, for defendant.

Notaro & Laing, LLP, Linda C. Laing, of counsel, Buffalo, New York, for Children's Hospital of Buffalo.

Kenneth A. Schoetz, Erie County Attorney, Alisa A. Lukasiewicz, George M. Zimmermann, Jr., Assistant County Attorneys, of counsel, Buffalo, New York, for Erie County Medical Center.

Phillips, Lytle, Hitchcock, Blaine & Huber, Lisa McDougall, of counsel, Buffalo, New York, for Sisters of Charity Hospital.

## DECISION and ORDER

FOSCHIO, United States Magistrate Judge.

### JURISDICTION

This matter was referred to the undersigned on May 26, 1998 for determination of any non-dispositive matters. In a Decision and Order, dated July 1, 1998 ("D & O"), the court granted Plaintiffs' motion to enforce subpoenas issued to non-parties Sisters of Charity Hospital ("Sisters Hospital") and Erie County Medical Center ("ECMC"), dated April 13, 1998 and denied non-party Children's Hospital of Buffalo's ("Children's Hospital") ("the hospitals") motion to quash Plaintiffs' subpoena, dated April 14, 1998. Treating the non-parties appeals of the Decision and Order as a motions for reconsideration, the matter was referred to the undersigned by the district judge on July 24, 1998.

### BACKGROUND

Plaintiffs' subpoenas seek "peer review" records as to procedures undertaken by Dr. Lorenzo T. Teruel and applications, including supporting documentation, submitted by Dr. Teruel for privileges at each of the non-party hospitals. Dr. Teruel was a Veteran's Administration Hospital physician whose surgery is at issue in this Fed-

eral Tort Claims Act case. Relying on New York Education Law § 6527 subd. 3 and New York Public Health Law § 2805–m, each of the non-party hospitals refused compliance asserting the requested information was privileged and thus exempt from disclosure under these statutes.

Section 6527 subd. 3 of the Education Law exempts from disclosure pursuant to Article 31 of the New York Civil Practice Act and Rules, providing for pretrial discovery in state court civil cases, "proceedings or records relating to performance of a medical or quality assurance review function." N.Y.Educ.L. § 6527 subd. 3 (McKinney 1985). As relevant, section 2805–m of the Public Health Law creates a similar exemption from disclosure for records relating to review of the quality of medical care given in hospitals, evaluation of staff privileges and credentials and capacity of health care providers employed by or associated with a hospital. N.Y. Public Health L. 2805–m (McKinney 1993). The statutes do not apply to statements made by a person attending a meeting of a quality assurance committee if the person is a party to an action the subject of which was reviewed at the meeting. Both statutes exclude the testimony of persons participating in such reviews as to what occurred at a quality assurance meeting. Additionally, both statutes provide for immunity from suit as to statements or actions taken in connection with such quality assurance review functions unless based on information which is "untrue and communicated with malicious intent." N.Y. Public Health Law § 2805–m (McKinney 1993). However, as the instant action is one pursuant to the Federal Tort Claims Act, the existence of an asserted privilege is a federal question to be determined in accordance with Fed.R.Evid. 501 (where federal law provides the rule of decision asserted privileges are to be determined in accordance with principles of the common law and based on "reason and experience"). Based on its review of relevant authority, the court found that a medical "peer review" privilege should not be rec-

ognized in federal actions. D & O at 12–13. Accordingly, it granted Plaintiffs' motion to compel and denied Children's Hospital's motion to quash.

Oral argument on the motion for reconsideration was conducted on January 28, 1999. Supplemental material in the form of copies of legislative history related to the New York statutes relied upon by the hospital non-parties were submitted on March 1, 1999 by Children's Hospital (Doc. # 106). Affidavits were also submitted by the medical director of each hospital (Affidavit of Charles Massaro, M.D., Medical Director, Sisters Hospital dated July 7, 1999) ("Massaro Affidavit") (Doc. # 107); (Affidavit of Margaret W. Paroski, M.D.,Medical Director, Erie County Medical Center dated July 15, 1999) ("Paroski Affidavit") (Doc. # 81); Affidavit of Paul Montgomery, M.D., President of the Medical Staff, Kaleida Health, successor to Children's Hospital, dated July 2, 1999) ("Montgomery Affidavit") (Doc. # 108). ECMC and Children's Hospital also submitted, in accordance with the court's order dated June 23, 1999, privilege logs describing the information relevant to Plaintiffs' subpoena as to which the privilege is asserted. (Doc.# 's 80, 109, respectively). Sisters Hospital had filed a privilege log with its opposition to Plaintiff's motion. For the reasons discussed, the non-parties' motion for reconsideration is GRANTED and upon reconsideration the court adheres to its Decision and Order of July 1, 1998 declining to recognize a medical peer review privilege.

## DISCUSSION

In the Decision and Order, the court relied on the Supreme Court's rejection of peer review privilege in *University of Pennsylvania v. EEOC*, 493 U.S. 182, 110 S.Ct. 577, 107 L.Ed.2d 571 (1990). D & O at 7 – 9. Additionally, the court found significant Congress' failure to establish a general medical peer review privilege when it enacted the Health Care Quality

Improvement Act of 1986, 42 U.S.C. § § 11101, *et seq.* ("HCQIA" or "the Act") which created qualified immunity from suit to officials conducting medical peer reviews, 42 U.S.C. § 11111(a)(1) (no liability under federal or state law except the Civil Rights Act of 1964, the Civil Rights Acts, and the actions by the United States and state attorney general), but did not protect documents created in the hospitals' peer review process, D & O at 8, (*citing Johnson v. Nyack Hospital,* 169 F.R.D. 550, 560 (S.D.N.Y.1996); *Robertson v. Neuromedical Center,* 169 F.R.D. 80, 84 (M.D.La.1996); *Swarthmore Radiation Oncology, Inc. v. Lapes,* 1993 WL 517722 (E.D.Pa.1993)). The court noted that under the Act, only the information submitted to the national health-care-quality clearinghouse established by the Act is confidential and not to be disclosed. D & O at 9. Based on the Supreme Court's rejection of a peer review privilege in *University of Pennsylvania, supra,* and Congress' failure to enact a privilege for medical peer review information in the HCQIA, the court held the requested information was not privileged as matter of federal common law. D & O at 12–13.

The hospitals contend that *University of Pennsylvania* is distinguishable as the competing interest in that case was enforcement of federal anti-discrimination in employment laws whereas in this case the issue is a malpractice claim. Memorandum of Law in Support of Objections to Magistrate Judge's Decision and Order, filed July 15, 1998 (Doc. # 39) ("Sisters Hospital Memorandum") at 8. However, in *University of Pennsylvania,* the fact that because the underlying action was based on job discrimination the Court found that Congress' failure to establish a peer review privilege when it enacted Title VII argued against doing so pursuant to the authority granted to the courts under Fed. R.Evid. 501. *University of Pennsylvania, supra,* at 189, 110 S.Ct. 577. The competing interest to the asserted privilege in *University of Pennsylvania* was the same interest in any litigation, *i.e.,* the "need for probative evidence." *Id.* (quoting *Trammel v. United States,* 445 U.S. 40, 51, 100 S.Ct. 906, 63 L.Ed.2d 186 (1980)).

■ Moreover, the hospitals' argument fails to recognize that Congress' waiver of sovereign immunity in the Federal Tort Claims Act for personal injury based on the torts of government agents also represents a "substantial governmental interest," Sisters Hospital Memorandum at 8, quoting *Robertson, supra,* at 83. To suggest that the search for truth by the courts has stronger justification and may override an asserted peer review privilege in a discrimination case but not a malpractice case minimizes the strong public interest in the prevention and compensation of serious personal injuries or death caused by government employees, an interest at least equal to the interest in eradicating and compensating for violations of a person's civil rights. The value of protection against job discrimination is substantially reduced if the ability to enjoy its benefit is physically impaired or ended. Privileges usually do not vary depending upon the nature of the action as their very purpose is to bar compelled disclosure irrespective of the nature of the proceeding in connection with which they may arise. The hospitals' attempt to distinguish *University of Pennsylvania* on the basis of the underlying causes of actions in that case and the other cases relied upon by the court from the one at bar is without merit.

The hospitals also contend that the court erred in failing to recognize that at least two cases, decided after *University of Pennsylvania,* "endorsed" a peer review privilege. Sisters Hospital Memorandum at 5–6. Specifically, Sisters Hospital asserts that the court overlooked *Freeman v. Fairman,* 917 F.Supp. 586 (N.D.Ill.1996) and *Brem v. DeCarlo, Lyon, Hearn & Pazourek, P.A.,* 162 F.R.D. 94 (D.Md.1995). However, as neither case is apposite neither was discussed by the court. In *Freeman,* the sole claim to which the requested discovery related was

a state wrongful death claim. Thus, the rule of decision being state law, the court's discussion of the possible existence of a peer review privilege under federal common law is dicta. Similarly, in *Brem*, the only claim in that case to which the deposition request at issue related was a state defamation claim, not the discrimination claims upon which federal removal jurisdiction was based. *Brem, supra*, at 96, 101. Hence, as the *Brem* court was required, pursuant to Fed.R.Evid. 501, to apply the Maryland peer review committee privilege statute, it did not determine the existence of a parallel privilege under federal common law. Additionally, *Freeman* does not attempt to distinguish *University of Pennsylvania's* rejection of a federal peer review privilege and *Brem* fails to even mention the decision. Thus, neither case supports the objection that the court failed to consider relevant case law upholding the existence of a medical peer review privilege following *University of Pennsylvania.*

The hospitals also argue that the court ignored applicable Second Circuit law. Sisters Memorandum at 9. Specifically, they rely on *United States v. One Parcel of Property at 31–33 York Street*, 930 F.2d 139 (2d Cir.1991), a forfeiture case in which a state law barring disclosure of juvenile offender records was at issue. In finding that the state's interest in maintaining the confidentiality of arrest records was outweighed by the federal interest in "presenting relevant information to the trier of fact," 930 F.2d at 141, the court stated where the asserted privilege is one of state law, under Fed.R.Evid. 501, "as a matter of comity federal courts accord deference to state-created privileges." 930 F.2d at 140. Hospitals interpret this statement to require the court to apply the

asserted New York medical peer review privilege statutes in this case. Sisters Memorandum at 11. However, the statement in *One Parcel of Property* does not bear the meaning hospitals attribute to it as the court gave no deference to the state statutory privilege rejecting it in favor of the general federal interest in enforcing forfeitures against illegal drug traffickers. 930 F.2d at 141. Thus, *One Parcel of Property* is also inapposite to this case.[1] Based on the Supreme court's explicit rejection of a peer review privilege in *University of Pennsylvania* and Congress' failure to enact a peer review privilege in the HCQIA, this court found no reason to "defer" to the New York statutory privileges asserted here. D & O at 12–13.

Finally, the hospitals maintain the court failed to give weight to the policy considerations underlying the peer review privilege relying upon statements in *Bredice v. Doctors Hospital, Inc.*, 50 F.R.D. 249, 250 (D.D.C.1970), *aff'd without opinion*, 479 F.2d 920 (D.C.Cir.1973)[2]; *Freeman, supra*, at 589; and *Gillman v. United States*, 53 F.R.D. 316, 318 (S.D.N.Y.1971). Sisters Hospital Memorandum at 10. Specifically, the hospitals assert, *id.* at 11, that the statements in these cases asserting that effective peer review of the care provided by physicians cannot occur in the absence of a privilege negate this court's finding the hospitals had failed to "provide any reason to believe some physicians would not provide candid appraisals of their peers absent the asserted privilege." D & O at 13. In so stating, the court relied on the Supreme Court's observation in *University of Pennsylvania*, that the record in that case failed to support the proposition that academics reviewers would withhold

1. *See also Johnson v. Nyack Hospital, supra*, at 558–59 n. 12 (questioning whether the statement in *One Parcel of Property at 31–33 York Street* regarding deference to state privileges as matter of comity is good law.)

2. In 1970, Fed.R.Civ.P. 34 required good cause for motion to compel disclosure of documents. As the court in *Bredice* found the request at issue was irrelevant to the malpractice case at bar, good cause was not established and the court's discussion of need for peer review confidentiality was thus dicta. *See Wei v. Bodner*, 127 F.R.D. 91, 100 (D.N.J. 1989).

candid appraisals absent a privilege. 493 U.S. at 196, 201, 110 S.Ct. 577.

As noted, following oral argument, the hospitals were allowed to supplement their motion with affidavits addressing the need for confidentiality in medical peer review. In his affidavit, Dr. Montgomery states that such confidentiality "facilitates frank and objective analysis of the quality of health services rendered [by physicians in a hospital]." Montgomery Aff., ¶ 9. Dr. Paroski avers that "confidentiality is essential to the effective functioning of the peer review process" which aids in assuring "adequate hospital care." Paroski Aff., ¶ ¶ 11, 12. Dr. Massaro believes that "[c]andid and conscientious evaluation of clinical practices are touchstones of adequate hospital care" which would be "impaired by subjecting such material to the discovery process." Massaro Aff., ¶ ¶ 11, 13. However, none of the doctors state that physicians would, without the benefit of a privilege either refuse to participate in the peer review process or offer inaccurate or untruthful evaluations. For example, only Dr. Montgomery opined that some physicians may choose not to participate in peer review, but that observation was limited to the absence of immunity from suit, Montgomery Aff., ¶ 11, which is not at issue.

■ Additionally, these opinions, similar to those expressed in the decisions relied upon by the hospitals, must be weighed against the findings by Congress in enacting the HCQIA. Specifically, Congress found that "[t]he increasing occurrence of medical malpractice and the need to improve the quality of medical care have become nationwide problems that warrant greater efforts...." 42 U.S.C. § 11101(1). Congress further determined that the threat of financial liability "unreasonably discourages physicians from participating in effective professional peer review." 42 U.S.C. § 11101(4). Thus, notwithstanding the existence, prior to 1986, of state peer review privilege laws, including New York's, the Act was needed to "deal with one important aspect of the medical malpractice problem in this country—incompetent and unprofessional physicians." H.R.Rep. No. 99–903, at 2 (1986), reprinted in 1986 U.S.C.C.A.N. 6384, 6384–85. The Report further stated that "[u]nfortunately, groups such as licensing boards, hospitals and medical societies that should be weeding out such incompetent or unprofessional doctors often do not do so." Id. (emphasis added). Significantly, Congress found that the lack of adequate peer reviews intended to reduce malpractice resulted not from the risk of disclosure of the information by peer reviewers but from the threat of lawsuits. As the Report stated

"Doctors who are sufficiently fearful of the threat of litigation will simply not do meaningful peer review. Thus, there is a clear need to do something to provide protection for doctors engaging in peer review if [the national reporting system established by the Act] is to be workable. To that end, the bill provides limited, but essential, immunity."

Id. at 3; 6385.

Thus, despite the opinions of the physicians put forth by the hospitals and the views expressed in cases including Bredice, effective peer review has not been shown to depend upon shielding peer review proceedings in the cloak of evidentiary privilege, rather, it is removal of the threat of litigation, both state and federal, as limited by the Act, that more directly promotes effective peer review and thereby more competent medical treatment. While the Act provides for confidential treatment of the peer review information reported to the national data bank established by the Act, there is no explicit declaration that either the underlying records of the reporting health care providers subject to the Act nor the national data bank records are granted a privileged status. See Johnson v. Nyack Hospital, 169 F.R.D. 550, 560 (S.D.N.Y.1996) ("Congress in providing protection for those involved in peer review, did not establish a privilege for most

documents created in that process."). *See also* Creech, Comment, The Medical Review Committee Privilege: A Jurisdictional Survey, 67 N.C.L.Rev. 179, 199 (Nov. 1988) ("the Act [HCQIA] itself does not appear to protect reports remaining within the hospital . . .").

▮ Although under Rule 501 the federal courts have authority to declare new privileges it is well established, as this court recognized, D & O at 7, that privileges are disfavored in the law. *Trammel v. United States,* 445 U.S. 40, 45, 100 S.Ct. 906, 63 L.Ed.2d 186 (1980). "The analysis should balance 'the public's need for the full development of relevant facts in federal litigation against the countervailing demand for confidentiality in order to achieve the objectives underlying the privilege in issue.'" D & O at 7 (quoting 2 J. Weinstein, M. Burger, J. McLaughlin, *Weinstein's Evidence* ¶ 501[03], at 39–41). "The balance does not often favor recognition of a new privilege unless it 'promotes sufficiently important interests to outweigh the need for probative evidence.'" D & O at 7 (quoting *University of Pennsylvania v. EEOC,* 493 U.S. 182, 189, 110 S.Ct. 577, 107 L.Ed.2d 571 (1990)).

In *Johnson, supra,* the court noted that "[t]he legislative history of the HCQIA . . . demonstrates that Congress considered the factors pertinent to whether such communications should be privileged, but chose only to grant immunity from suit to doctors who participate in peer review." *Johnson, supra,* at 561 n. 15 (*citing* H.R.Rep. No. 99–903, 99th Congress., 2d Sess. 3, 9–10 (1986)). Congress, in enacting the HCQIA, considered the need for confidentiality of the peer review process and balanced that need with other competing interests. *Teasdale v. Marin General Hospital,* 138 F.R.D. 691, 694 (N.D.Cal. 1991). As the court in *Teasdale* concluded, "Congress spoke loudly with its silence in not including a privilege against discovery of peer review materials in the HCQIA." *Teasdale, supra,* at 694. Thus, there is no basis for the hospitals' objection that the D & O "misconstrued" congressional intent. Sister's Hospital Memorandum at 12. As the court in *Johnson, supra,* stated "[courts] should bear[ ] in mind the Supreme Court's admonition that courts should be 'especially reluctant to recognize a privilege in an area where it appears that Congress has considered the relevant competing concerns but has not provided the privilege itself.'" *Johnson, supra,* at 561 (quoting *University of Pennsylvania,* 493 U.S. at 189, 110 S.Ct. 577).

Nor does the hospitals' reliance upon the enactment by most states of confidentiality statutes covering peer review proceedings establish that the court should have "deferred" to state law. Sister's Hospital Memorandum at 10. Under Fed.R.Evid. 501, courts are to apply common law principles using "reason and experience" in determining whether the proposed privilege should be recognized. *University of Pennsylvania, supra,* at 189, 110 S.Ct. 577. The assumption that strict confidentiality in peer review proceedings is essential to the delivery of competent health care was, as discussed, rejected by Congress after extensive considerations leading to enactment of the HCQIA. The legislative history relating to New York's adoption of the present form of that state's peer review non-disclosure statutes, as submitted by Children's Hospital, is consistent with Congress' failure to adopt a federal medical peer review privilege. Upon careful reading, those materials emphasize the need for immunity from suit rather than immunity from disclosure as the primary requisite to effective peer review, the same conclusion reached by Congress. Indeed, as of 1986, in New York, the record established that neither policy had achieved its purpose. *See, e.g.,* Governor's Program Bill Memorandum Re: S– 9470; A– 11584 (1986) noting "[s]teady and substantial increases in the numbers and the size of malpractice claims *and awards* . . . in recent years." Statement in Support of the Bill, Exhibit F (Doc. # 106) (emphasis added).

**308**

Moreover, although courts "should not ignore the wisdom of state lawmakers," *Johnson, supra,* at 559, "the existence and importance of a state privilege is but one of the factors which the court must balance to see whether a new privilege would be justified." 2 J. Weinstein & Margaret Berger, *Weinstein's Evidence* § 501[3], at 501–48 (1996). While all states have now adopted some form of the medical peer review privilege, as to those states which have more recently enacted such statutes there is no reason to believe the quality of health care in those states was appreciably below that enjoyed by the residents of states where a medical peer review privilege was enacted at an earlier time.[3] Further, as the court in *Johnson* noted, variations among the state privilege statutes, *Johnson, supra,* at 559, cast doubt on whether such statutes can usefully serve as guide to the federal courts in establishing a uniform policy. *Id.* Thus, the court finds an absence of objective experience supporting the view that strict confidentiality of peer reviews is an essential prerequisite to achieving the public's interest in maintaining quality health care.

Finally, the hospitals have submitted a recent case, *Weekoty v. United States,* 30 F.Supp.2d 1343 (D.N.M.1998), recognizing a medical peer review in a Federal Tort Claims Action. For the reasons discussed, this court, respectfully, disagrees with the court's reasoning in *Weekoty.* First, *Weekoty* asserts, relying on a law review article, Creech Comment, The Medical Review Committee Privilege: a Jurisdictional Survey, *supra,* that the peer review privilege has a "unique role in preserving the public health." *Weekoty, supra,* at 1345. However, a complete reading of the article reveals it is primarily a commentary on the state peer review statutes and relevant case law and contains no objective studies or other opinion to support the court's broad assertion. Second, the court held

that considerations of comity required deference to the New Mexico peer review privilege statute. *Weekoty* at 1346. As discussed, *supra,* deference to state privilege statutes is not required for federal courts. Third, although the court notes that the HCQIA establishes confidentiality for certain records relating to the peer review process, the court makes no attempt to address Congress' failure to enact a federal privilege for all such records the absence of any such privilege. Thus, the court's analysis is in opposition to the Supreme Court's admonition in *University of Pennsylvania* that courts should hesitate in finding a privilege when Congress has declined to do so.

The court in *Weekoty* also relied on an analogy between justifications for the psychotherapist-patient privilege, approved by the Supreme Court in *Jaffee v. Redmond,* 518 U.S. 1, 116 S.Ct. 1923, 135 L.Ed.2d 337 (1996) and those asserted in support of the privilege for medical peer reviews. *Weekoty* at 1346. However, the need of the individual to be assured that sensitive personal information, a precondition to obtaining competent care, will not be revealed without his or her consent cannot be compared to the institutional interest in eliminating incompetency and improving the quality of care. Physicians and hospitals have an overriding professional obligation and economic incentive to improve the quality of medical care they provide thereby potentially reducing malpractice insurance rates and improving profitability regardless of the availability of strict confidentiality. Whatever degree of confidentiality may also be needed to obtain participation in effective peer reviews can be provided by the courts without imposing inflexible obstacles to their fundamental role of seeking truth and doing justice. While as the court in *Weekoty* stated, a medical peer review conference may well result in understanding life saving techniques, *id.,* the record does not support

**3.** Hospitals contended 46 states had enacted such legislation. Sister's Hospital Memorandum at 10.

the conclusion that such benefits would be withheld by physicians unless their discussions are treated as privileged.

Therefore, this court finds that neither reason nor experience justify extending to medical peer review records a privilege against disclosure in federal cases. Whatever valid confidentiality concerns may exist can be addressed in a confidentiality agreement as the court directed.

## CONCLUSION

Based on the foregoing, reconsideration is GRANTED, and upon reconsideration the court adheres to its Decision and Order of July 1, 1998 as to the existence of a federally recognized medical peer review privilege.

SO ORDERED.