**Theresa L. (Derringer) TUCKER, Plaintiff,**

v.

**UNITED STATES of America and Raleigh General Hospital, d/b/a Columbia Raleigh General Hospital, Defendants.**

**No. Civ.A. 5:00–0495.**

United States District Court, S.D. West Virginia, Beckley Division.

April 6, 2001.

---

Edward G. Atkins, Douglas V. Atkins, ATKINS & ATKINS, Charleston, WV, for Theresa L. (Derringer) Tucker.

Stephen M. Horn, Assistant U.S. Attorney, Charleston, WV, for U.S.

Paul T. Farrell, Farrell, Farrell & Farrell, Huntington, WV, for Raleigh Gen. Hosp.

### MEMORANDUM OPINION AND ORDER

FEINBERG, United States Magistrate Judge.

This action arises out of the alleged negligence of John H. Pellegrini, D.O., in performing an hysterectomy on Plaintiff, and of defendant Raleigh General Hospital ("Raleigh General") in granting and continuing staff privileges to Dr. Pellegrini. At the time of the surgery, Dr. Pellegrini was an agent and employee of an entity covered by the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671 *et seq.*

Count One of Plaintiff's Amended Complaint is brought pursuant to the FTCA and alleges Dr. Pellegrini's negligence. This claim against the United States under the FTCA confers federal question jurisdiction on the court pursuant to 28 U.S.C. § 1331. Count Two alleges that defendant Raleigh General was negligent in selecting, retaining and supervising Dr. Pellegrini as a member of its medical staff in the specialty of obstetrics and gynecology. Jurisdiction is founded upon 28 U.S.C. § 1367, supplemental jurisdiction of a state law claim related to the claim in Count One.

Pending before the court are "Plaintiff, Theresa L. (Derringer) Tucker's Motion

for an Order Compelling Answers to Interrogatories #3 – #23 Inclusive, of Plaintiff's First Set of Interrogatories to Defendant, Raleigh General Hospital, Served on October 3, 2000" (Document #35), and "Plaintiff, Theresa L. (Derringer) Tucker's Motion for Order Compelling Defendant, Raleigh General Hospital, to Produce the Documents Requested in Requests #1 – #9, Inclusive and #12 – #14, Inclusive of Plaintiff's First Request for Production of Documents to Defendant, Raleigh General Hospital, Served on October 3, 2000" (Document #36), both filed November 13, 2000. In her motions, Plaintiff seeks an order compelling Raleigh General to respond to a number of interrogatories and document requests, all of which, according to Plaintiff, relate to what information Raleigh General had when it decided to offer staff privileges to Dr. Pellegrini.

On November 22, 2000, Defendant Raleigh General responded and moved for a protective order. (Document #38.) Raleigh General asserted a good faith belief that the information and documents sought to be compelled by Plaintiff are protected by West Virginia's peer review privilege found at West Virginia Code § 30–3–1 *et seq.*

The court will not limit its consideration to Count Two only. It is unlikely that information relating to Raleigh General's knowledge of Dr. Pellegrini's abilities would not be used by the parties with respect to Count One. *See Robertson v. Neuromedical Center,* 169 F.R.D. 80, 82 (M.D.La.1996) (the court cannot segregate the discovery into what would be relevant to the federal claim versus the state law claims).

On December 6, 2000, this court entered an order indicating that it would undertake *in camera* review of the documents asserted by Raleigh General to be privileged and protected by West Virginia Code § 30–3C–

3 and that Raleigh General should provide the court with an index/privilege log by a certain date. (Document #40.) On December 12, 2000, Raleigh General filed a supplemental disclosure of documents that were not protected by West Virginia Code § 30–3C–3. (Document #42.) In addition, on December 26, 2000, Raleigh General filed a "Response to Plaintiff's Motion to Compel and Production of Privilege Log Regarding Credentialing Information Regarding Dr. John Pellegrini." (Document #43.)

The court determined that it was necessary to hold a hearing on the pending discovery motions, particularly in light of conflicting case law on the issue of whether federal common law or West Virginia law governs the assertion of privilege as to each count in the Amended Complaint. (Document #48.) Following a hearing on March 6, 2001, the parties were permitted to submit legal memoranda regarding this issue. The United States, Raleigh General and Plaintiff each filed a brief on March 13, 2001, March 16, 2001, and March 16, 2001, respectively. (Document ##53, 54, 55.) On March 23, 2001, Raleigh General and Plaintiff responded. (Document ##57, 58.)

Rule 501 of the Federal Rules of Evidence provides as follows:

> Except as otherwise required by the Constitution of the United States or provided by Act of Congress or in rules prescribed by the Supreme Court pursuant to statutory authority, the privilege of a witness ... shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience. However, in civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the privilege of a witness ... shall be

determined in accordance with State law.

Pursuant to the second sentence of Rule 501, the court must determine whether state law supplies the rule of decision as to Counts I and II of Amended Complaint. If it does, Rule 501 requires that state privilege law applies. In that instance, the court must determine whether West Virginia Code § 30–3C–3 precludes production of the documents in question. If state law does not supply the rule of decision, federal privilege law applies, and the court must determine whether a federal privilege exists as to medical peer review records or if not, whether one should be recognized.

Count I of the Amended Complaint alleges a claim against the government pursuant to the Federal Tort Claims Act ("FTCA"). Under the FTCA, the United States waives its sovereign immunity and allows suit to be brought against it. The FTCA provides that "[t]he United States shall be liable ... in the same manner and to the same extent as a private individual under like circumstances...." 28 U.S.C. § 2674. In addition, 28 U.S.C. § 1346(b)(1), the statute conferring jurisdiction on District Courts for FTCA claims, provides that

> the district courts ... shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, ... for injury ... caused by the negligence or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

On its face, it would seem that the obvious result in applying Rule 501 in the context of the FTCA would be that state law supplies the rule of decision. Congress did explicitly indicate in the FTCA that state law is to be used in determining whether the United States is liable under the FTCA. However, such a literal application of Rule 501 is inconsistent with the legislative history of Rule 501, which supports a finding that Congress intended federal privilege law to apply in FTCA cases.

In *Young v. United States,* 149 F.R.D. 199, 202–04 (S.D.Cal.1993), the court examined the legislative history of Rule 501 in finding that federal, not state, privilege law applies in determining the discovery of evidence in a FTCA case. In *Young,* the court explained that the House Judiciary Committee drafted the proposed Rule 501 in essentially the same form as it was enacted. With respect to the second sentence of Rule 501, the House Judiciary Committee intended to require the application of state privilege law in civil actions and proceedings governed by *Erie R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), and explained that " '[t]he Committee believes that in civil cases in the federal courts where an element of a claim or defense is not grounded upon a federal question, there is no federal interest strong enough to justify departure from State policy.' " *Young,* 149 F.R.D. at 202 (quoting H.R.Rep. No. 650, 93d Cong., 2d Sess. (1974), *reprinted in* 1974 U.S.C.C.A.N. 7075, 7082–83).

When the House Committee circulated its version of Rule 501 for national review and comment, the Department of Justice raised the issue of the applicability of state privilege law in FTCA cases. The Department of Justice pointed out that as worded, the Rule did not limit dependence on state law solely to diversity actions. The Department of Justice wrote that

> [t]his poses a real problem. There are thus statutes which make state law de-

terminative in cases in which the United States may be a party (*e.g., Federal Tort Claims Act* ). There is generally no reason in those instances to apply state law in matters regarding the admissibility of evidence and claims of privilege. Before a blanket rule applicable to all such cases is adopted, Congress should examine each of the instances in which state law is applicable to actions involving the United States and determine whether the policy considerations favoring uniformity of procedure in actions involving the United States should prevail. The last sentence of the rule should be amended to reflect these views.

*Young,* 149 F.R.D. at 203 (emphasis added) (quoting *Department of Justice Analysis and Recommendations Regarding Draft of Proposed Rules of Evidence of the Subcommittee on Criminal Justice, House Committee on the Judiciary,* H.R. 5463, 93d Cong., 1st Sess. 347 (1973) (statement of William D. Ruckelshaus, Acting Deputy Attorney General)).

Although the Senate then proposed a bill that might have addressed these concerns, the Senate–House Conference ultimately adopted the House version of Rule 501. According to the court in *Young,* although the Conference adopted the House version, the Conference responded to the concerns of the Department of Justice in the following statement:

> In nondiversity jurisdiction civil cases, federal privilege will generally apply. In those situations where a federal court adopts or incorporates state law to fill interstices or gaps in federal statutory

phrases, the court generally will apply federal privilege law ... When a federal court chooses to absorb state law, it is applying the state law as a matter of federal common law. Thus, state law does not supply the rule of decision (even though the federal court may apply a rule derived from state decisions), and state privilege law would not apply.

*Young,* 149 F.R.D. at 203 (quoting Conf. Rep. No. 1597, 93d Cong., 2d Sess. (1974), *reprinted in* 1974 U.S.C.C.A.N. 7098, 7101).[1]

█ In light of this statement, the court in *Young* concluded that Congress was aware of the privilege issue in the context of FTCA cases and "clearly stated its intent that Rule 501 require[s] application of federal privilege rules when the federal court is absorbing state law as the federal law." *Young,* 149 F.R.D. at 203–04; *accord Galarza v. United States,* 179 F.R.D. 291, 293 (S.D.Cal.1998) (Plaintiff brought suit under FTCA and, based on *Young,* court determined that federal law governed the application of privilege.); *Menses v. United States Postal Service,* 942 F.Supp. 1320, 1323–24 (D.Nev.1996) (The Court, citing the legislative history of Rule 501, concluded that "[b]ecause federal courts only adopt state law under the Federal Tort Claims Act, federal law still supplies the rule of decision under Rule 501 and state privilege law does not apply to Federal Tort Claims Act cases."); *Syposs v. United States,* 179 F.R.D. 406, 411 (W.D.N.Y.1998) (citing *Young* ), *adhered to on reconsideration by Syposs v. United States [Syposs II* ], 63 F.Supp.2d 301

---

1. The court in *Young* also noted that Congress expressed this intent against the background of statements by the Supreme Court that the FTCA incorporates state law into the federal law. *Young,* 149 F.R.D. at 202, 204; *see, e.g., Feres v. United States,* 340 U.S. 135, 142, 71 S.Ct. 153, 95 L.Ed. 152 (1950) (28 U.S.C. § 1346(b) "assimilates into federal law the rules of substantive law of the several states, among which divergencies are notorious"); *Moor v. County of Alameda,* 411 U.S. 693, 701 n. 11, 93 S.Ct. 1785, 36 L.Ed.2d 596 (1973) (stating that "[i]t, of course, is not uncommon for Congress to direct that state law be used to fill the interstices of federal law", and that a ready example can be found in the FTCA).

(W.D.N.Y.1999). Stated differently, "Congress recognized that when federal courts merely adopt state law as federal law, there is no need to apply state law in matters such as the admissibility of evidence and claims of privilege, and that federal privilege law controls. It is only where state law is operative of its own force that state law supplies the rule of decision, and, under Rule 501, state privilege law governs." *Menses*, 942 F.Supp. at 1322.

While there are a handful of FTCA cases holding that because the FTCA explicitly indicates that state law applies in determining the negligence of the United States, state law supplies the rule of decision, the court finds these cases lacking in analysis and awareness regarding the legislative history behind Rule 501. *Ellis v. United States*, 922 F.Supp. 539, 540 (D.Utah 1996); *Oslund v. United States*, 128 F.R.D. 110, 113–14 (D.Minn.1989); *Huzjak v. United States*, 118 F.R.D. 61, 63 (N.D.Ohio 1987); *Schuler v. United States*, 113 F.R.D. 518, 520 (W.D.Mich.1986).

In addition to the compelling legislative history as outlined by the court in *Young*, the court is persuaded further by the fact that under the FTCA, the United States waives the sovereign immunity it ordinarily enjoys under the express condition that federal courts retain exclusive jurisdiction to hear cases arising under the Act. *See* 28 U.S.C. § 1346(b)(1) "The deliberate limitation placed on Federal Tort Claims Act cases by Congress is due to the federal government's substantial interest in the application of uniform laws in light of its subjection to widespread litigation. To permit the imposition of divers[e] state privilege laws to Federal Tort Claims Act cases would allow the uneven administration of the law that the Supreme Court identified in *Clearfield* [*Clearfield Trust Co. v. United States*, 318 U.S. 363, 63 S.Ct.

573, 87 L.Ed. 838 (1943) ] and that Rule 501 attempts to avoid." *Menses*, 942 F.Supp. at 1324; *Young*, 149 F.R.D. at 204.

The court is sensitive to the arguments of Raleigh General and the United States that this case is in federal court only because of insurance coverage provided to Dr. Pellegrini's employer by the Federally Supported Health Centers Assistance Act, 42 U.S.C. § 233(g)–(n). Dr. Pellegrini was employed by Community Health Systems, Inc., doing business as Rural Acres Clinic (collectively referred to as "Community Health"). Upon motion by the United States, all three were dismissed from this action on the basis that Dr. Pellegrini and his employer, Community Health, were deemed employees of the United States by virtue of Community Health's eligibility for FTCA malpractice coverage. In their place, the United States was substituted as a defendant. (Document # 6.) Thereafter, Plaintiff amended her complaint to allege a claim under the FTCA against the United States.

The fact that the FTCA comes into play in this case because Dr. Pellegrini's employer was eligible for malpractice coverage from a federal source rather than because Dr. Pellegrini worked at a veterans' hospital or some other federal institution is of no import. This fact does not make the FTCA any less applicable, nor does it dissuade the court from applying federal privilege law with respect to Count I or, as discussed further below, Count II of the Amended Complaint.

Furthermore, the court finds that federal rather then state privilege law should apply to the pendent state law claim in Count II of the Amended Complaint. Although Rule 501 does not explicitly address the question of which law should apply to pendent state law claims, the advisory committee notes to Rule 501 pro-

vide some guidance on the issue of pendent state law claims in a federal question case: "It is also intended that the Federal law of privileges should be applied with respect to pendent State law claims when they arise in a Federal question case." Fed. R.Evid. 501 advisory committee's note.

Moreover, a number of circuits have held that the federal law of privilege governs where the evidence sought is relevant to both federal and state law claims. *von Bulow v. von Bulow*, 811 F.2d 136, 140 (2d Cir.), *cert. denied*, 481 U.S. 1015, 107 S.Ct. 1891, 95 L.Ed.2d 498 (1987) (In a RICO action with pendent state law claims, federal privilege law applies where the evidence relates to both the state and federal claims.); *Wm. T. Thompson Co. v. General Nutrition Corp., Inc.*, 671 F.2d 100, 104 (3d Cir.1982) (In a federal antitrust action with pendent state law claims, federal privilege law applies to all claims.); *Hancock v. Dodson*, 958 F.2d 1367, 1372–73 (6th Cir.1992) (In a federal civil rights case with pendent state law claims, federal privilege law applies to all claims.); *Memorial Hosp. v. Shadur*, 664 F.2d 1058, 1061 n. 3 (7th Cir.1981) (In a federal antitrust action, federal law controls on the question of privilege, notwithstanding the presence of a state law claim.); *Hancock v. Hobbs*, 967 F.2d 462, 466–67 (11th Cir.1992) (Federal privilege law supplies the rule of decision in a federal civil rights case, even if witness testimony is relevant to pendent state law claims.). In *General Nutrition Corp.*, the court explained that "applying two separate disclosure rules with respect to different claims tried to the same jury would be unworkable," and therefore, held that "when there are federal law claims in a case also presenting state law claims, the federal rule favoring admissibility, rather than any state law privilege, is the controlling rule." *General Nutrition Corp.*, 671 F.2d at 104. Likewise, within the Fourth Circuit, the court in the class action case of *Lewis v. Capital Mortgage Invs.*, 78 F.R.D. 295, 313 (D.Md.1977), rejected the argument that state law supplies the rule of decision simply because there was a pendent state law claim.

Finally, at least one court has addressed the issue in the context of a FTCA action with pendent state law claims. In *In re Combustion, Inc.*, 161 F.R.D. 51, 53–54 (W.D.La.), *aff'd*, 161 F.R.D. 54 (W.D.La. 1995), the court determined that federal privilege law would be applied to all privilege issues affecting discovery in a case involving claims under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9601, *et seq.*, the FTCA and pendent state law claims. The court was persuaded by the fact that the federal interests were strong because both CERCLA and the FTCA provided for exclusive federal jurisdiction. The court also relied upon the "general policies of the federal rules favoring uniformity and simplicity...." *In re Combustion*, 161 F.R.D. at 54. Thus, the court finds that privilege issues related to discovery of the pendent state law claim against Raleigh General in Count II of the Amended Complaint also are governed by federal law.

Lastly, because the court has determined that federal common law applies, the court must determine whether the federal common law recognizes a peer review privilege and if not, whether one ought to be recognized.

■ In *Jaffee v. Redmond*, 518 U.S. 1, 8, 116 S.Ct. 1923, 135 L.Ed.2d 337 (1996), the Supreme Court set forth the principles to be considered in determining when "Rule 501 of the Federal Rules of Evidence authorizes federal courts to define new privileges by interpreting 'common law privileges ... in the light of reason and experience.'" The Supreme Court

stated that for any privilege to be added to the federal common law, the privilege must promote "sufficiently important interests to outweigh the need for probative evidence." *Jaffee,* 518 U.S. at 9, 116 S.Ct. 1923 (quoting *Trammel v. United States,* 445 U.S. 40, 51, 100 S.Ct. 906, 63 L.Ed.2d 186 (1980)). The analysis must be made on a case-by-case basis, and take into account both the public and private interests that the privilege serves, as well as the evidentiary benefit that would result if the privilege were denied. *Jaffee,* 518 U.S. at 8, 11, 116 S.Ct. 1923.

More recently, the Supreme Court explained that this balancing test often does not favor recognition of a new privilege unless it " 'promotes sufficiently important interests to outweigh the need for probative evidence....' " *University of Pa. v. EEOC,* 493 U.S. 182, 189, 110 S.Ct. 577, 107 L.Ed.2d 571 (1990) (quoting *Trammel,* 445 U.S. at 51, 100 S.Ct. 906). Further, because privileges contravene the fundamental principle that " 'the public ... has a right to every man's evidence,' [citations omitted], any such privilege must be 'strictly construed.' [citation omitted]" *University of Pa.,* 493 U.S. at 189, 110 S.Ct. 577. In light of these directives, the Supreme Court in *University of Pa.,* a case brought against the University under Title VII of the Civil Rights Act of 1964, rejected the University's claim that peer review materials relating to the tenure process were privileged, noting that in extending Title VII to educational institutions, Congress failed to create a privilege for peer review documents. *University of Pa.,* 493 U.S. at 189–92, 110 S.Ct. 577.

The court adopts the reasoning of the court in *Syposs,* a FTCA case, in which the court applied the above factors and declined to recognize a federal peer review privilege. *Syposs v. United States,* 179 F.R.D. 406, 411 (W.D.N.Y.1998), *adhered to on reconsideration by Syposs v. United States [Syposs II],* 63 F.Supp.2d 301 (W.D.N.Y.1999). In *Syposs,* the court relied upon *University of Pa.,* and in particular, the Supreme Court's reasoning that where Congress had the opportunity to create a privilege pursuant to statute, yet failed to do so, courts should be especially hesitant in recognizing a federal privilege.

The court in *Syposs* cites to a number of cases where other courts, also relying on *University of Pa.,* declined to adopt a federal peer review privilege. *Johnson v. Nyack Hosp.,* 169 F.R.D. 550, 560 (S.D.N.Y.1996) (race discrimination case citing *University of Pa.); Robertson v. Neuromedical Center,* 169 F.R.D. 80, 83–84 (M.D.La.1996) (Americans with Disabilities Act case citing *University of Pa.); Swarthmore Radiation Oncology, Inc. v. Lapes,* No. CIV.A. 92–3055, 1993 WL 517722, at *2–4 (E.D.Pa. Dec.1, 1993) (antitrust case citing *University of Pa.).*

As in *University of Pa.,* the courts in those cases were persuaded by the fact that in enacting the Health Care Quality Improvement Act of 1986 ("HCQIA"), 42 U.S.C. § 11101 *et seq.,* which provided qualified immunity for persons supplying information to a professional review body regarding the competence or professional conduct of a physician, Congress had the opportunity to establish a privilege for peer review documents, but declined to do so.[2] *Johnson,* 169 F.R.D. at 560–61; *Rob-*

---

**2.** Under the HCQIA, information submitted to the national health-care quality clearinghouse established by the Act is confidential and not to be disclosed. 42 U.S.C. §§ 11131(a), 11134(b) and 11137(b)(1). However, the documents submitted to the court *in camera* provide no indication that they were submitted to the national clearinghouse, nor has Raleigh General provided any further indication that this was the case.

*ertson,* 169 F.R.D. at 83–84; *Swarthmore,* 1993 WL 517722, at \*3. As the court in *Teasdale v. Marin General Hosp.,* 138 F.R.D. 691, 694 (N.D.Cal.1991) (emphasis added), stated:

> the passage of a statute specifically addressing peer review issues and, indeed, the giving of qualified immunity to peer reviewers, is strong evidence that Congress not only considered the importance of maintaining the confidentiality of the peer review process, but took the action it believed would best balance protecting such confidentiality with other important federal interests. Congress spoke loudly with its silence in *not* including a privilege against discovery of peer review materials in the HCQIA.

The United States attempts to distinguish the circumstances of this case from those presented in *University of Pa.* The United States argues that in *University of Pa.,* the Court was asked to create a new privilege, i.e., a peer review privilege in the context of the tenure process, whereas in the instant situation, medical peer review privilege already exists by state statute. Therefore, according to the United States, the only issue is whether West Virginia law will be applied in this federal forum. Although "[a] strong policy of comity between state and federal sovereignties impels federal courts to recognize state privileges where this can be accomplished at no substantial cost to federal substantive and procedural policy [citation omitted]", *Shadur,* 664 F.2d at 1061, the court cannot conclude that recognition of a federal peer review privilege in this instance would promote "sufficiently important interests to outweigh the need for probative evidence." *University of Pa.,* 493 U.S. at 189, 110 S.Ct. 577. Instead, "[w]hether the public interest would be served by a medical peer review privilege in federal cases requires a weighing of interests more appropriate for Congress

than for the courts." *Syposs,* 179 F.R.D. at 412. This is especially true with respect to a medical peer review privilege, one that Congress had the opportunity to recognize under the HCQIA, but did not.

Finally, the United States urges the court to adopt the reasoning of the court in *Weekoty v. United States,* 30 F.Supp.2d 1343 (D.N.M.1998). In *Weekoty,* the court recognized a self-critical analysis privilege in a FTCA case. Although the court in *Weekoty* noted that the HCQIA establishes confidentiality for certain records relating to the peer review process, *Weekoty,* 30 F.Supp.2d at 1347, the court made no attempt to address Congress' failure to enact a blanket federal peer review privilege. *Syposs II,* 63 F.Supp.2d at 308. Furthermore, the court's reliance on *Jaffee,* 518 U.S. 1, 116 S.Ct. 1923 (1996), wherein the Court recognized the psychotherapist-patient privilege, is misplaced. The court, acknowledging the *Jaffee* Court's recognition that all fifty states and the District of Columbia had enacted some form of the psychotherapist privilege, reasoned by analogy that "the nearly unanimous state legislative recognition of the self-critical analysis privilege in the medical peer review context confirms the appropriateness of recognizing the privilege in this forum." *Weekoty,* 30 F.Supp.2d at 1346–47. As the court in *Syposs II* found

> the need of the individual to be assured that sensitive personal information [as in the psychotherapist privilege situation], a precondition to obtaining competent care, will not be revealed without his or her consent cannot be compared to the institutional interest in eliminating incompetency and improving the quality of care. Physicians and hospitals have an overriding professional obligation and economic incentive to improve the quality of medical care they provide thereby potentially reducing malpractice insur-

ance rates and improving profitability regardless of the availability of strict confidentiality. Whatever degree of confidentiality may also be needed to obtain participation in effective peer reviews can be provided by the courts without imposing inflexible obstacles to their fundamental role of seeking truth and doing justice.

*Syposs II,* 63 F.Supp.2d at 308.

Accordingly, it hereby is **ORDERED** that Plaintiff, Theresa L. (Derringer) Tucker's Motion for an Order Compelling Answers to Interrogatories # 3 – # 23 Inclusive, of Plaintiff's First Set of Interrogatories to Defendant, Raleigh General Hospital, Served on October 3, 2000 (Document # 35), and Plaintiff, Theresa L. (Derringer) Tucker's Motion for Order Compelling Defendant, Raleigh General Hospital, to Produce the Documents Requested in Requests # 1 – # 9, Inclusive and # 12 – # 14, Inclusive of Plaintiff's First Request for Production of Documents to Defendant, Raleigh General Hospital, Served on October 3, 2000 (Document # 36), are **GRANTED.** Defendant Raleigh General is directed to answer the interrogatories, and to produce the information and documents submitted to the court *in camera,* and any other documents which are responsive to the above discovery requests, before the close of business on April 26, 2001. The parties are further directed to draft and enter into a confidentiality agreement with respect to the production of such information and documents. It is further **ORDERED** that Defendant Raleigh General Hospital's Motion for Protective Order in Response to Plaintiff's Motion to Compel (Document # 36) is **DENIED.**

The Clerk is requested to mail copies of this Order to counsel of record.