**Sundar V. NILAVAR, M.D., Plaintiff,**

v.

**MERCY HEALTH SYSTEM–WESTERN OHIO, et al., Defendants.**

No. C–3–99–612.

United States District Court,
S.D. Ohio,
Western Division.

Sept. 13, 2002.

Lee Charles Falke, Lee C. Falke & Associates, Dayton, OH, Kenneth A. Lazarus, Maggi Ann Lazarus, Kenneth A. Lazarus & Assoc, Washington, DC, for plaintiff.

Scott D. Phillips, Frost Brown Todd LLC–1, Cincinnati, OH, John Kevin Cogan, Ronald E. Laymon, Jones Day Reavis & Pogue–2, Columbus, OH, Thomas Demitrack, Jones Day Reavis & Pogue, Cleveland, OH, for defendants.

DECISION AND ENTRY SUSTAINING PLAINTIFF'S MOTION TO COMPEL DISCOVERY (DOC. # 69) AND SUSTAINING PLAINTIFF'S MOTION TO DEFER SUBMISSION OF EXPERTS' REPORTS PENDING ENTRY OF REVISED SCHEDULING ORDER (DOC. # 76); CONFERENCE CALL SET FOR PURPOSES OF ESTABLISHING A REVISED SCHEDULING ORDER

RICE, Chief Judge.

The facts of this case were set forth in an earlier Decision and Entry of the Court (*see* Expanded Opinion, December 20, 2000 (Doc. # 50) (ruling on several motions)), and will be

reviewed only briefly herein.[1]  Plaintiff Sundar V. Nilavar, M.D., is a radiologist who for years was employed by Springfield Radiology, Inc. ("SRI").  Up until 1995, SRI physicians provided diagnostic radiology services to three hospitals in the Springfield and Urbana areas, in Ohio, two of which are owned by Defendant Mercy Health Systems–Western Ohio ("MHS–WO").  As of 1991, SRI was comprised of eleven principals.  In March of 1995, MHS–WO invited different radiologists and radiology groups to tender proposals to be its exclusive provider of radiology services.  Around that time, one of the SRI principals, Defendant Dr. Robin E. Osborn, left SRI to form his own radiology services group, Diagnostic Imaging Associates of Ohio, Inc. ("DIA"), also named as a Defendant herein.  Dr. Osborn took several of his fellow SRI shareholders with him to DIA, but Dr. Nilavar was not among them.  In December of 1995, DIA was awarded the contract by MHS–WO to be its exclusive provider of radiology services.  In turn, Dr. Nilavar's privileges at the MHS–WO hospitals were terminated.

Subsequently, in a state-court action for breach of contract and related common law claims, Dr. Nilavar prevailed against Dr. Osborn.  The action in this Court was filed in November of 1999, and originally alleged eight counts: two arising under federal antitrust law, one arising under Ohio antitrust law, and the other five arising under various other state law causes of action.  Multiple Defendants were named.

Currently before the Court is Plaintiff's Motion to Compel Discovery (Doc. # 69), which concerns two Defendants, MHS–WO and Catholic Healthcare Partners ("CHP"), MHS–WO's parent company (collectively, "Defendants").  In a previous Decision and Entry, the Court dismissed several claims against these Defendants.  (*See* Doc. # 50 at 61–62.)[2]  Still viable, as to them, are Plaintiff's federal and state antitrust claims, to the extent they are based on an alleged restraint of trade (Counts One and Three), and several of the other supplemental state law claims (Counts Four, Six (in part), Seven, and Eight).

In his Motion to Compel Discovery, Plaintiff seeks to compel disclosure of the following information (requested pursuant to Rules 33 & 34 of the Federal Rules of Civil Procedure ("Rules")): 1) descriptions of any complaints or other concerns, of any kind and originating from any source, related to the radiology services provided at hospitals and other facilities owned by MHS–WO; 2) copies of any documents related thereto; 3) identities of every physician whose application to provide radiology services to Mercy Medical Center of Springfield, Ohio, or Memorial Hospital of Urbana, Ohio (collectively, "Mercy Hospitals"), was denied, between the dates of December 4, 1985, and December 4, 1995; 4) descriptions of any internal reports prepared at the Mercy Hospitals between December 4, 1985, and December 4, 1995, related to radiology privileges; 5) copies of same; 6) identities and qualifications of every individual who evaluated the quality of performance of Dr. Osborn and other DIA radiologists, as related to their services provided to the Mercy Hospitals; 7) copies of any evaluation so prepared; 8) various other documents and records.  Furthermore, by way of a Supplemental Memorandum (Doc. # 82), Plaintiff seeks to compel disclosure of descriptions of specific allegations of compromised radiology services provided by the Mercy Hospitals, and any responses the Mercy Hospitals have given with respect thereto; the details of any complaints concerning radiology care at the Mercy Hospitals from 1990 to the present; and the details of all hearings held at the Mercy Hospitals between 1990 and 2001, related to the revocation of a physician's privileges.

---

**1.** Because the Motions *sub judice* concern only questions of law, the Court will draw its facts from its Expanded Opinion of December 20, 2000 (Doc. # 50).

**2.** With respect to Defendants MHS–WO and CHP, the Court dismissed one of the federal antitrust claims (Count Two), the state-law antitrust claim, to the extent it was based on an alleged illegal tying arrangement (Count Three), and a portion of a state law claim of civil conspiracy, to the extent it was based on an alleged breach of implied covenant of good faith and fair dealing, federal and antitrust claims, and a violation of 26 U.S.C. § 501(c)(3) (Count Six).

Defendants have objected to all of these requests, claiming that the information Plaintiff seeks is protected by a peer review privilege. The first question presented herein is whether state or federal law of privileges should apply. The second question presented is whether, under the applicable law, a peer review privilege exists. A third question presented is whether Plaintiff agreed to honor such a privilege as a matter of contract with Defendant, regardless of whether such a privilege exists at law. As an ancillary issue, Defendants argue that Plaintiff's cause of action as a whole is predominated by his state law claims, and that his federal antitrust claim is of no merit, such that, in the event federal law controls, and does not recognize the peer review privilege, he should not be allowed to invoke federal procedural law merely by asserting a frivolous federal claim.

In addition to moving to compel certain discovery, Plaintiff has filed a Motion to Defer Submission of Experts' Reports Pending Entry of a Revised Scheduling Order (Doc. # 76). Defendants do not object to this Motion, except to request that the filing of their own experts' reports also be deferred. (*See* Doc. # 78.) Plaintiff's Motion to Defer is hereby SUSTAINED, and Defendants, too, shall be permitted to defer the filing of their own experts' reports. As discussed below, the Court will schedule a conference call at which revised deadlines for the filing of said reports shall be a topic for discussion.

## I. *Analysis*

In general terms, "peer review," as it relates to medical practice, is the system by which groups or committees of physicians review the work of their colleagues to evaluate the soundness of the colleague's medical decisions in any given situation. The practice serves several purposes. Most notably, it helps root out incompetence in the medical profession, which, in turn, leads to a higher overall level of health care for patients. In addition, patients' awareness of this practice fosters a level of reassurance that they are receiving proper care. While the practice is invaluable to the profession of medicine, reviewing physicians have an obvious interest in maintaining the confidentiality of their reviews, particularly so as not to become implicated in any civil suit which may arise out of the treating physician's negligence.[3] The import of Defendants' assertion of privilege in objecting to Plaintiff's various discovery requests is easily recognized: privileged matter is not discoverable. *See* Fed.R.Civ.P. 26(b)(1).

The Court will begin by addressing Defendants' concern that Plaintiff has asserted a federal antitrust claim merely to circumvent, for purposes of discovery, the peer review privilege of Ohio, which they contend is firmly embedded in Ohio law. The Court finds Defendants' argument on this point not well taken. The Court previously overruled their Motion to Dismiss (Doc. # 17) as it related to Plaintiff's First Count, arising under Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1 ("Sherman Act"). (*See* Doc. # 50 at 32, 62.) Having already found that Plaintiff has stated a claim under the Sherman Act, there is no need to revisit that matter here, or to convert Defendants' Opposition brief (Doc. # 70) into a motion for summary judgment. Accordingly, the Court will proceed to the question of which law of privileges, state or federal, is applicable.

■ That question is readily answered by reference to the Sixth Circuit's holding in *Hancock v. Dodson*, 958 F.2d 1367 (6th Cir. 1992). In that case, addressing Rule 501 of the Federal Rules of Evidence ("Rule 501"), which concerns evidentiary privileges,[4] the

---

3. Patient privacy interests and rights are also implicated, to the extent peer review reports discuss actual patient names.

4. This rule provides:

Except as otherwise required by the Constitution of the United States or provided by Act of Congress or in rules prescribed by the Supreme Court pursuant to statutory authority, the privilege of a witness, person, government,

State, or political subdivision thereof shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience. However, in civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the privilege of a witness, person, government, State, or political subdivision

Sixth Circuit held that where there are both federal and supplemental state law claims at issue, the federal common law of privileges controls as to the entire case. 958 F.2d at 1373. *See also Freed v. Grand Court Lifestyles, Inc.*, 100 F.Supp.2d 610, 612 (S.D.Ohio 1998). Accordingly, Defendants' argument that Ohio's law of privileges should control is not persuasive.

■ Thus, the Court reaches the heart and soul of the parties' disagreement: whether the federal common law recognizes a peer review privilege. If it does, then that is the end of the inquiry. If it does not, a secondary question is presented, namely, *should* the privilege be recognized in this instance. *See* Fed.R.Evid. 501 (providing that privileges barred by other law "shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience"); *University of Pa. v. Equal Employment Opportunity Comm'n*, 493 U.S. 182, 189, 110 S.Ct. 577, 107 L.Ed.2d 571 (1990) (recognizing that Rule 501 provides federal courts with the flexibility to develop rules of privilege on a case-by-case basis).

The primary question is actually more narrow than whether a peer review privilege exists. Given that peer review is a practice in other disciplines besides medicine, *see, e.g., University of Pa., supra* (discussing peer review in the context of academia), the more focused question is whether there is a "physician" peer review privilege in the federal common law, keeping in mind that the relevant case law is that in which the federal law of privileges has controlled.

The parties do not cite, because it does not exist, Supreme Court precedent on this particular question. However, in *University of Pa.*, the Court did note that "[a] privilege for peer review materials has no ... historical or statutory basis." 493 U.S. at 195, 110 S.Ct. 577. While it is true that in that case, the Supreme Court was addressing a university's contention that an *academic* peer review privilege existed which protected it from hav-

ing to disclose tenure-review files, it is also true that in reaching its conclusion that such a privilege does not exist, the Court reviewed other privileges grounded in notions of the importance of maintaining confidentiality. *Id.* at 194–95, 110 S.Ct. 577. Thus, this Court finds that the Supreme Court's holding in *University of Pa.*, that a peer review privilege has no support in its precedents, is persuasive outside the context of the facts of that case, even if not necessarily controlling. The Supreme Court has not revisited the peer review privilege issue in the years following *University of Pa.*

The parties also do not cite, because again it does not exist, Sixth Circuit precedent on the question of a physician peer review privilege. Indeed, it appears that only two circuit courts have ever addressed this issue.[5] That observation, coupled with the lack of Supreme Court precedent, is probably enough on which to base a finding that the federal common law has not evolved to the point that it recognizes a *de jure* physician peer review evidentiary privilege. Nevertheless, this Court will review the cases that have discussed the question, beginning with the cases relied upon by Defendants, to cast a brighter light on the topic.

Defendants point to seven federal court cases in support of the proposition that a physician peer review privilege exists: *Armstrong v. Dwyer*, 155 F.3d 211 (3rd Cir.1998); *Cohn v. Wilkes General Hosp.*, 127 F.R.D. 117 (W.D.N.C.1989); *Laws v. Georgetown University Hosp.*, 656 F.Supp. 824 (D.D.C. 1987); *Doe v. St. Joseph's Hosp. of Fort Wayne*, 113 F.R.D. 677 (N.D.Ind.1987); *Mewborn v. Heckler*, 101 F.R.D. 691 (D.D.C. 1984); *Morse v. Gerity*, 520 F.Supp. 470 (D.Conn.1981); and *Bredice v. Doctors Hospital, Inc.*, 50 F.R.D. 249 (D.D.C.1970). (Doc. # 70 at 4.) The Court will address them in turn.

The relevant discovery issue in *Armstrong*, a case from the Third Circuit, was governed by a federal statute, not common law. Therein, in a medical malpractice case, the plaintiff sought material from a peer review

---

thereof shall be determined in accordance with State law.

**5.** *See Virmani v. Novant Health, Inc.*, 259 F.3d 284 (4th Cir.2001); *Memorial Hosp. for McHenry County*, 664 F.2d 1058 (7th Cir.1981).

organization ("PRO") which had investigated the defendant physician's care of the plaintiff. The court held that the materials sought were privileged. The holding was not grounded in federal common law; rather, it was grounded in a federal statute which prohibited disclosure of such materials where the peer review organization was acting pursuant to its contractual duties to the Secretary of Health and Human Services, to wit, to review the quality of Medicare health care services in the geographical area for which it was contracted to perform. 155 F.3d at; *see* 42 U.S.C. §§ 1320c–1320c 13. In other words, disclosure was expressly forbidden by statute. *See* 42 U.S.C. § 1320c 9(d) (prohibiting disclosure of "document[s] or other information produced by [a PRO] in connection with its deliberations [made pursuant to its contractual duties] . . . in any administrative or civil proceeding"). Because no such set of facts is presented in this case, the holding in *Armstrong* is inapplicable.

▮ In *Cohn,* the District Court for the Western District of North Carolina held that a state law peer review privilege applied to the supplemental state law claim stated therein. 127 F.R.D. at 120. This could never be the case in the Sixth Circuit, however, pursuant to the rule set forth in *Hancock, supra.* As to the federal claim stated in *Cohn,* arising, as in this case under the Sherman Act, the court found that a policy favoring a physician peer review privilege was demonstrated by the passage of the Health Care Quality Improvement Act of 1986, 42 U.S.C. § 11101, *et seq.* ("HCQIA"), wherein Congress noted the need to protect the confidentiality of physician peer review materials so as not to discourage physicians from engaging in such practice out of fear of liability under other federal laws. 127 F.R.D. at 120–21; *see also* 42 U.S.C. § 11101(4) & (5). In the HCQIA, Congress specifically found that physicians' fears of treble damage liability under the Sherman Act "unreasonably discourages physicians from participating in effective professional peer review." 42 U.S.C.

§ 11101(4). Although the HCQIA was inapplicable to the facts of that case, the *Cohn* court found that its existence demonstrated a federal policy favoring the recognition of a peer review privilege. 127 F.R.D. at 121.

This Court is not persuaded by the *Cohn* court's analysis of the import of the HCQIA. The HCQIA was enacted in the interest of both reducing medical incompetence and protecting physicians who take part in the peer review process, which ultimately exposes such medical incompetence. 42 U.S.C. § 11101. In return for requiring "professional review bodies," defined as groups of health care professionals who review the work of their colleagues,[6] to report[7] to the Secretary of Health and Human Services ("Secretary"),[8] among other things, any action taken which adversely affects a physician's clinical privileges,[9] the statute guarantees that all such information "reported under this subchapter [shall be] considered confidential and shall not be disclosed," except under certain circumstances not relevant herein. *Id.* § 11137(b)(1). Far from creating a broad privilege, Congress, in enacting the HCQIA, carefully crafted a very specific privilege, applicable to peer review material *submitted to the Secretary* pursuant to the dictates of the mandatory reporting provisions of that statute. That is as far as Congress went, and that is as far as this Court should apply the privilege contained therein. *See Wei v. Bodner,* 127 F.R.D. 91, 99 (D.N.J.1989). Thus, to the extent the *Cohn* court found that the HCQIA was demonstrative of a peer review privilege greater than the one specifically set forth therein, this Court disagrees.

*Laws* was a malpractice case. The plaintiff had suffered a heart attack while undergoing a Caesarean childbirth, and the District Court for the District of Columbia found that a letter describing the complications of the delivery, written by the attending obstetrician to the chairman of the Department of Anesthesiology at the defendant hospital, was privileged. 656 F.Supp. at 825. The

---

**6.** 42 U.S.C. § 11151(11).

**7.** *Id.* § 11133(a)(1).

**8.** *Id.* § 11151(12).

**9.** *Id.* § 11151(3) (defining "clinical privileges" to include the privilege to provide medical care).

court found that the letter had been considered as part of a peer review of the attending obstetrician's work. Relying solely on an earlier opinion out of the same court, *Bredice, supra,* the *Laws* court reasoned that protecting the confidentiality of such information was of paramount importance to encouraging and maintaining the "flow of information which may be most valuable" to the peer review process, and ultimately to the "public interest in promoting improvement in health care." 656 F.Supp. at 826. No mention was made of Rule 501.[10]

Similarly, in *Bredice,* upon which the *Laws* court relied, it was held that the minutes and reports of a hospital's staff meetings, sought by the malpractice plaintiff, were privileged. 50 F.R.D. at 250. The court reasoned that the confidentiality of the material was essential to the proper functioning of the staff meetings. In turn, the meetings, it was found, were held for the purpose of evaluating the medical care provided by the hospital (i.e., "self-analysis"), which, ultimately, led to the "continued improvement in the care and treatment of patients." *Id.* No discussion was given to the federal common law or national trends; the lone supporting citation of authority was a reference to a civil procedure treatise, which was quoted for the proposition that " '[t]he public interest may be a reason for not permitting inquiry into particular matters by discovery.' " *Id.* (quoting 4 Moore, Federal Practice ¶ 26.22(2) (2d ed.1969)). The *Bredice* court also discounted the necessity of the peer review material, finding them to be merely retrospective in their focus, and not organic evidence of the actual treating physician's care. *Id.* at 250 & 251.

■ It should not go unobserved that *Bredice* was decided prior to the adoption of Rule 501 (which was promulgated in 1975). Furthermore, *Bredice* and *Laws* both in-

volved medical malpractice suits which in any other political jurisdiction within the remainder of the United States would probably have been handled in state court, pursuant to state laws.[11] Those two facts, along with the fact that neither the *Bredice* nor *Laws* court critically examined the federal common law on the subject, limit the persuasiveness of those two holdings.

*Morse* is completely inapposite. In that case, the District Court of Connecticut, addressing a state law claim, applied Connecticut law in holding that peer review materials were not discoverable. 520 F.Supp. at 471 & 472. However, even where the Federal Rules of Civil Procedure have applied, several other courts have deferred to state rules of privilege. For example, in *St. Joseph's,* the District Court for the Northern District of Indiana, after enumerating the pertinent considerations that a federal judge is to make under a Rule 501 analysis, ruled that unless and until the plaintiff could show more than a scintilla of evidence on how the peer review materials he sought in discovery were relevant to his federal discrimination claim, the court would not so much as review them *in camera.* 113 F.R.D. at 680. Though not controlling, the court found persuasive a state statute which expressed the clear policy of the State of Indiana that peer review materials were privileged. Similarly, in *Mewborn,* the District Court for the District of the District of Columbia, presented with a claim arising under the Federal Tort Claims Act, 28 U.S.C. § 2671, *et seq.,* denied discovery of peer review materials to the plaintiff. The *Mewborn* court relied heavily on the analysis in *Bredice,* as well as the persuasive authority of a provision of the District of Columbia Code (not in effect at the time *Bredice* itself was decided), which prohibited discovery of peer review material "absent a showing of extraordinary necessity." 101

10. Indeed, Plaintiff herein attempts to discount all of the opinions generated in the District Court of the District of Columbia, as being based not on principles of federal law so much as on principles of District of Columbia law. This argument has some merit, given the unusual nature of the governance of the District of Columbia, and the fact that the federal courts therein often wear two hats, being arbiters of both federal and local disputes, notwithstanding the fact that in 1970,

Congress did create a distinct District of Columbia court system for the handling of purely local disputes.

11. Even in diversity cases, *see* 28 U.S.C. § 1332, Rule 501 requires the federal district courts to apply the *forum state's* rule on the particular privilege at issue.

F.R.D. at 693 (citing D.C.Code § 32–505). As did the *Bredice* court, the *Mewborn* court discounted the probative value of the retrospective peer review evaluations, particularly where "raw factual data" was discoverable, such as the reports of the treating care providers. *Id.* In other words, given that other, non-privileged, discoverable evidence was available, on which the merits of the plaintiff's claim could be fully fleshed out and his experts could base an opinion, the after-the-fact evaluations were of limited importance.

Finally, in a case not cited by Defendants, *Weekoty v. United States,* 30 F.Supp.2d 1343 (D.N.M.1998), the District Court for the District of New Mexico held that in the somewhat narrower context of peer review related to morbidity and mortality conferences (i.e., evaluations of alleged physician-caused deaths), a privilege should be recognized in the federal common law. 30 F.Supp.2d at 1348 (labeling the privilege as a "self-critical analysis" privilege).[12] In reaching its conclusion, the court was persuaded by the rationale of *Bredice,* concerning the importance of confidentiality in a hospital's self-evaluation process, and the fact that "at least forty-six states and the District of Columbia" have laws prohibiting the disclosure of peer review material. *Id.* at 1345 & 1346.

In contradistinction to *St. Joseph's, Mewborn,* and *Weekoty,* all of which purportedly looked to federal common law in some degree or another to find the existence of a peer review privilege, the vast majority of the federal courts which have explored this issue have concluded differently. *See, e.g., Virmani v. Novant Health, Inc.,* 259 F.3d 284 (4th Cir.2001); *Memorial Hosp. for McHenry County v. Shadur,* 664 F.2d 1058 (7th Cir. 1981); *Johnson v. United Parcel Serv., Inc.,*

206 F.R.D. 686 (N.D.Fla.2002); *Mattice v. Memorial Hosp. of South Bend,* 203 F.R.D. 381 (N.D.Ind.2001); *Leon v. County of San Diego,* 202 F.R.D. 631 (S.D.Cal.2001); *Krolikowski v. University of Mass.,* 150 F.Supp.2d 246 (D.Mass.2001); *Tucker v. United States,* 143 F.Supp.2d 619 (S.D.W.Va.2001); *Marshall v. Spectrum Medical Group,* 198 F.R.D. 1 (D.Me.2000); *Syposs v. United States,* 179 F.R.D. 406 (W.D.N.Y.1998), *adhered to upon reconsideration,* 63 F.Supp.2d 301 (1999); *Holland v. Muscatine General Hosp.,* 971 F.Supp. 385 (S.D.Iowa 1997); *Price v. Howard County Gen. Hosp.,* 950 F.Supp. 141 (D.Md.1996); *Robertson v. Neuromedical Ctr.,* 169 F.R.D. 80 (M.D.La.1996); *Pagano v. Oroville Hosp.,* 145 F.R.D. 683 (E.D.Cal. 1993); *LeMasters v. Christ Hosp.,* 791 F.Supp. 188 (S.D.Ohio 1991); *Quinn v. Kent Gen. Hosp., Inc.,* 617 F.Supp. 1226 (D.Del. 1985); *Ott v. St. Luke Hosp. of Campbell County, Inc.,* 522 F.Supp. 706 (E.D.Ky.1981); *Wei, supra; Robinson v. Magovern,* 83 F.R.D. 79 (W.D.Pa.1979); *United States v. United Network for Organ Sharing,* 2002 WL 1726536 (N.D.Ill. May 17, 2002); *Salamon v. Our Lady of Victory Hosp.,* 2002 WL 436766 (W.D.N.Y. Feb.12, 2002); *U.S. ex rel. Roberts v. QHG of Indiana, Inc.,* 1998 WL 1756728 (N.D.Ind. Oct.8, 1998); *Pickett v. Woodland Heights Gen. Hosp., Inc.,* 1997 WL 394822 (E.D.Tex. June 18, 1997); and *Swarthmore Radiation Oncology, Inc. v. Lapes,* 1993 WL 517722 (E.D.Pa. Dec.1, 1993).

This latter set of cases, along with the Supreme Court's recognition that a peer review privilege has no historical basis in the common law of the federal courts, *University of Pa.,* 493 U.S. at 195, 110 S.Ct. 577,[13]

---

**12.** The Court notes that while some cases discuss a "self-critical analysis" privilege, and others discuss a "peer review" privilege, the two concepts stem from the same trunk. Some courts note a distinction between the two; others do not. The "self-critical analysis" is merely a way of describing, for example, a hospital's regular review, or evaluation, of its own in-house practices, and the work of its care givers. *See Bredice,* 50 F.R.D. at 250; *Weekoty,* 30 F.Supp.2d at 1345–48; *Wei,* 127 F.R.D. at 100–01 (referring to a "self-evaluative privilege"). It is, in other words, a more broadly focused, or generalized, variant of peer review, which itself tends to be case-specific. (In

addition, peer review can come from foreign quarters; it need not be conducted by colleagues employed by a common employer.) *See Johnson v. United Parcel Serv., Inc.,* 206 F.R.D. 686, 689 n. 1 (N.D.Fla.2002).

**13.** Although *University of Pa.* was, as noted, concerned more specifically with academic peer review, several courts have found it dispositive, or at least highly persuasive, on the issue of peer review in the medical profession context. *See, e.g., Syposs v. United States,* 63 F.Supp.2d 301, 304 (W.D.N.Y.1999); *Salamon,* 2002 WL 436766, at *2.

persuades this Court that a physician peer review privilege does not exist in the federal common law. Nevertheless, although the Supreme Court has stated that Rule 501 is not to be interpreted "expansively," *see id.* at 189, 110 S.Ct. 577, the cases cited by Defendants reveal that lower courts have not felt inhibited from recognizing new privileges on an *ad hoc* basis in the absence of Supreme Court precedent. This observation bears on the secondary question of whether the physician peer review privilege should be recognized in this instance even though it is clearly not part of the established common law.

■ Rule 501 instructs that a court should look to "reason and experience" in assessing the applicability of a yet unrecognized privilege (or substantially unrecognized privilege). The starting point in this analysis is the general rule that "the public has a right to every man's evidence." *Trammel v. United States,* 445 U.S. 40, 50, 100 S.Ct. 906, 63 L.Ed.2d 186 (1980) (quoting *United States v. Bryan,* 339 U.S. 323, 331, 70 S.Ct. 724, 94 L.Ed. 884 (1950)). Any infringements upon the "predominant principle of utilizing all rational means for ascertaining the truth," *Jaffee v. Redmond,* 518 U.S. 1, 9, 116 S.Ct. 1923, 135 L.Ed.2d 337 (1996), are to be strictly construed. *University of Pa.,* 493 U.S. at 189, 110 S.Ct. 577. At tension in the law of privileges is, on one hand, the public benefit that comes from keeping certain information confidential, and, on the other, the public benefit that comes from ascertaining the truth of a matter, as facilitated by the disclosure of all relevant information. *See Trammel,* 445 U.S. at 50, 100 S.Ct. 906; *University of Pa.,* 493 U.S. at 189, 110 S.Ct. 577; *Jaffee,* 518 U.S. at 9, 116 S.Ct. 1923. Only when the former outweighs the latter, which is to say, only when keeping the matter concealed will serve a greater public utility than would revealing same, should a privilege be recognized. Thus, it has been stated that to recognize matter as privileged, its concealment must promote an important interest that outweighs the need for probative evidence. *See Trammel,* 445 U.S. at 51, 100 S.Ct. 906.

The federal courts have recognized the privileged character of attorney-client communications, *see Upjohn Co. v. United States,* 449 U.S. 383, 389, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981), spousal communications, *see Trammel, supra,*[14] psychotherapist-patient communications, *see Jaffee,* 518 U.S. at 11, 116 S.Ct. 1923, clergy-penitent communications, *see In re Grand Jury Investigation,* 918 F.2d 374, 381–83 (3rd Cir.1990) (recognizing the privilege and acknowledging other federal circuit and district courts which have recognized same),[15] and a qualified privilege for presidential communications. *See United States v. Nixon,* 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974). On the other hand, the federal courts have rejected the privileged character of physician-patient communications, *Hancock,* 958 F.2d at 1373,[16] and of

---

**14.** The spousal communications privilege, which is absolute, is not to be confused with the separate privilege a spouse has of not having to give adverse testimony in a criminal trial against the other. The former is shared by both spouses; the latter is owned exclusively by the witness-spouse. Thus, for example, while a husband being tried for a crime can prevent his wife from testifying as to any confessions he made to her in confidence, he cannot prevent her from testifying as to criminal conduct she actually observed. In neither instance could the prosecution compel the wife to testify. *See generally Trammel,* 445 U.S. at 43–53, 100 S.Ct. 906.

**15.** *But see Seidman v. Fishburne–Hudgins Educ. Found., Inc.,* 724 F.2d 413, 415 (4th Cir.1984) (stating in dicta that the "clergyman-communicant privilege has no firm foundation in common law") (citing Wigmore, Evidence § 2394 (McNaughton rev.1961)).

**16.** In dicta, the Supreme Court, in *Trammel,* stated that "privileges between priest and penitent, attorney and client, *and physician and patient,*" are "rooted in the imperative need for confidence and trust." 445 U.S. at 51, 100 S.Ct. 906. The Fourth Circuit, in *In re Grand Jury Investigation,* observed that this statement had spawned a multitude of lower court decisions recognizing the priest-penitent, or clergy-penitent, privilege. 918 F.2d at 382–83. The Sixth Circuit's decision in *Hancock,* rendered twelve years after *Trammel,* rejecting the recognition of the physician-patient privilege, clearly circumscribes the import of the Supreme Court's statement. *See also Whalen v. Roe,* 429 U.S. 589, 602 n. 2, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977) ("The physician-patient privilege is unknown to the common law.").

academic peer review communications. *See University of Pa., supra.*

As seems apparent, the overwhelming majority of cases discussing the peer review privilege, as a product of the federal common law, have cast its lot into the latter camp. Indeed, Defendants do not ask this Court to rule in their favor on a case of first impression (though the issue has not been addressed often in the courts of the Sixth Circuit); rather, they ask the Court, under the facts of this case, to recognize an exception to the great weight of extant authority. Notwithstanding the Supreme Court's recognition that Rule 501 is flexible, and allows for the recognition of new privileges on a case-by-case basis, *see id.* at 189, 110 S.Ct. 577, this Court doubts the wisdom of reading Rule 501 so flexibly as to find that an almost universally-rejected privilege may yet have merit under the totality of circumstances of an isolated case. While the law of privileges is not static, it is reasonable to believe that new privileges should nevertheless have a certain universal appeal to them. For example, in *Jaffee*, although the Supreme Court affirmed the court of appeal's recognition of a psychotherapist-patient privilege, it disagreed that the application of the privilege, as the Seventh Circuit had held, was subject to *ad hoc* "balancing" tests.

> We reject the balancing component of the privilege implemented by that court and a small number of States. Making the promise of confidentiality contingent upon a trial judge's later evaluation of the relative importance of the patient's interest in privacy and the evidentiary need for disclosure would eviscerate the effectiveness of the privilege. As we explained in *Upjohn*, if the purpose of the privilege is to be served, the participants in the confidential conversation 'must be able to predict with some degree of certainty whether particular discussions will be protected. An uncertain privilege, or one which purports to be certain but results in widely varying applications by the courts, is little better than no privilege at all.' 449 U.S. at 393, 101 S.Ct. 677.

518 U.S. at 17, 116 S.Ct. 1923. *See also Syposs*, 63 F.Supp.2d at 304 ("Privileges usually do not vary depending upon the nature of their action as their very purpose is to bar compelled disclosure irrespective of the nature of the proceeding in connection with which they may arise.").

▇ In other words, a privilege should either be recognized in the common law, or it should not. Its application should not turn on whether, for example, the claim, which appears later in time to the occurrence of the so-called confidential communication, is one arising under malpractice law, discrimination law, or antitrust law.[17] Given this, the Court is of the opinion that while there must always be, in the absence of legislation, that court which takes the first step into an area left to common law development, where so many other courts have taken the step in the opposite direction, pressing ahead against the grain would appear unwise.

Nevertheless, so as not to foreclose upon Defendants' arguments prematurely, a closer look shall be given to the Supreme Court's most recent "new privilege" case. In *Jaffee*, the plaintiff had sought the session notes of a clinical social worker who had treated the defendant on about fifty occasions.[18] The defendant objected to the discovery request on the basis of a psychotherapist-patient privilege. 518 U.S. at 5, 116 S.Ct. 1923. The district court refused to recognize the privilege, and, after the defendant refused to comply with the its order to disclose these notes, and further refused to respond to re-

---

17. This observation is not in conflict with the notion that even extant privileges should be strictly construed. *See Trammel*, 445 U.S. at 50, 100 S.Ct. 906. To say that a privilege must be strictly construed is not to limit its applicability to certain causes of action; it is merely to limit the parameters of the privilege, with an eye toward preventing parties, under the false aegis of "privilege," from withholding objectively unprivileged communications from the discovery process.

18. The defendant in *Jaffee* was a former police officer who was being sued under 42 U.S.C. § 1983 for use of excessive force stemming from a shooting death which had occurred in the course of her duties. The plaintiff was the administrator of the estate of the individual whom the defendant officer had shot and killed.

lated questions at her deposition and on the witness stand, it instructed the jury that it could presume that the plaintiff was concealing damaging evidence. *Id.* at 5–6, 116 S.Ct. 1923. On appeal of the jury's verdict in favor of the plaintiff, the Seventh Circuit reversed, finding that the recognition of the psychotherapist-patient privilege, under the facts of that case, outweighed the importance of the information's disclosure. *Id.* at 6–7, 116 S.Ct. 1923.

The Supreme Court began its analysis by noting that the courts of appeals were not in agreement as to whether such a privilege should be recognized. *Id.* at 7, 116 S.Ct. 1923. It concluded by finding that "reason and experience" persuaded it that such a privilege should be recognized, as it " 'promotes sufficiently important interests to outweigh the need for probative evidence.' " *Id.* at 9–10, 116 S.Ct. 1923 (quoting *Trammel,* 445 U.S. at 51, 100 S.Ct. 906). The Court analogized the psychotherapist-patient privilege to the attorney-client privilege, noting that both were " 'rooted in the imperative need for confidence and trust.' " *Id.* at 10, 116 S.Ct. 1923 (quoting *Trammel, supra*). In the absence of absolute confidentiality, the Court found, psychotherapeutic counseling would fail to serve the ends for which it is intended, to wit, the treatment of mental and emotional problems, which cannot be done successfully if patients cannot be assured that the highly sensitive subject matter they are divulging will be kept secret. *Id.* at 10–11, 116 S.Ct. 1923. Moreover, the Court opined that if the privilege were not to be recognized, the ends of justice would be no better off in the long run because many of the personal divulgences that might have otherwise been relevant to a civil action would never be made by the patient in the first instance (because of the fear that they would not be kept confidential). *Id.* at 11–12, 116 S.Ct. 1923. Thus, there would be nothing to discover. The Court also found it relevant that all fifty states and the District of Columbia recognized the privilege in one form or another. *Id.* at 12, 116 S.Ct. 1923. "Denial of the federal privilege therefore would frustrate the purposes of the state legislation that was enacted to foster these confidential communications." *Id.* at 13, 116 S.Ct. 1923.

If *Jaffee* were the only source of authority for the Court's decision in this case, Defendants' argument that a physician peer review privilege should be recognized would pose a close question indeed. As with the psychotherapist-patient privilege recognized in *Jaffee,* the states are substantially, if not completely, in harmony in recognizing a physician peer review privilege. *See Weekoty,* 30 F.Supp.2d at 1346 (listing sources collecting the relevant statutes). However, the great weight of the *federal* cases, many of them decided after *Jaffee,* counsel that such a privilege does not exist in the federal common law, and should not be recognized in a case such as this. Furthermore, as alluded to above, predictable law is sound law, and consistent and uniform jurisprudence is what should undergird the federal judiciary. To paraphrase a maxim attributed to Cicero, and more frequently invoked in admiralty, the law cannot be one thing in Rome and another in Athens.

Even considering the arguments raised by Defendants on why the physician peer review privilege should be recognized in this instance, the Court finds that the importance of protecting the confidentiality of the particular information at issue would not "transcend[ ] the ... predominant principle of utilizing all rational means for ascertaining the truth." *See Jaffee,* 518 U.S. at 9, 116 S.Ct. 1923. The Court does not question that, generally speaking, it is important to the integrity of the peer review process that communications made pursuant thereto remain confidential. It is also not to be overlooked that, although not controlling, Ohio has joined the vast majority of states in enacting a prohibition on the disclosure of peer review material in civil actions. *See* Ohio Rev.Code §§ 2305.24, 2305.25 & 2305.251. Nevertheless, while state interests are an important consideration, their importance in a federal case fluctuates in direct correlation with the extent to which they are consistent with federal policies. *See, e.g., Price,* 950 F.Supp. at 143; *United States v. King,* 73 F.R.D. 103, 105 (E.D.N.Y. 1976).

Without the comforting guarantee of absolute confidentiality, it is unlikely that, in the clergy-penitent context, many people of faith would seek penitence or spiritual guidance; or that, in the attorney-client context, the truth in both civil and criminal matters would be anything more than an illusory ideal; or that, in the psychotherapist-patient context, emotionally distraught individuals would seek professional consultation for their illnesses. Defendants have not convinced this Court that the need for confidentiality in the peer review process, as implicated in this particular case, rises to the highest level of importance as it does in those other contexts, or that the process will not function properly in the absence of a federal evidentiary privilege. In the absence of any argument as to why these Defendants in particular, or others implicated by the peer review information at issue, will be harmed by the information's disclosure, the Court does not find that the purely rhetorical arguments on matters of comity and the importance of confidentiality in the peer review process overcome Plaintiff's "need for information sufficient to prove [his] allegations." *LeMasters,* 791 F.Supp. at 191; *see also Shadur,* 664 F.2d at 1063; *Pagano,* 145 F.R.D. at 695; *Swarthmore,* 1993 WL 517722, at *3; *Price,* 950 F.Supp. at 144. The numerous decisions from other federal courts rejecting the privilege, and the Sixth Circuit's expressed preference for not expanding the common law of privileges, *see Hancock,* 958 F.2d at 1373; *G.M.C. v. Director of the Nat'l Inst. for Occupational Safety and Health,* 636 F.2d 163, 165 (6th Cir.1980), reinforce this conclusion.

Furthermore, on Plaintiff's side of the equation, there is the obvious desire for liberal discovery. Rule 26(b)(1) of the Federal Rules of Civil Procedure provides that a plaintiff is entitled to obtain any unprivileged matter that is relevant to his claim, and that matter is relevant "if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." Defendants make no argument on *why* the information which

Plaintiff seeks herein is not relevant, other than to state that it is not. (Doc. # 70 at 6 & n. 4.) Even in probing this question on its own, the Court finds ample reason to compel discovery of the peer review materials. The Court has previously noted that one of Plaintiff's allegations is that "patient care in the relevant geographic market has been harmed by the lack of competition." (Doc. # 50 at 20.) Discovery of information concerning any complaints about the radiology services at the MHS–WO facilities could very well lead to relevant evidence supporting this allegation. The impact on other radiologists' abilities to perform in the relevant market is also a relevant concern of Plaintiff's, and bears on another of his allegations. (*See id.*) Information regarding the quality of care offered by Dr. Osborn could likewise be a source of potentially relevant evidence. Moreover, Defendants have not demonstrated that this information could be procured from any other source.

■ The Court is not persuaded by Defendants' attempt to distinguish the line of cases which have rejected the physician peer review privilege in the antitrust context. Defendants argue that the cases cited by Plaintiff on this point, namely *Shadur,* 664 F.2d 1058, *Pickett,* 1997 WL 394822, *Price,* 950 F.Supp. 141, *Pagano,* 145 F.R.D. 683, and *Swarthmore,* 1993 WL 517722, are inapposite, because, in those cases, it had been alleged that the peer review process itself was being utilized as the vehicle to violate the antitrust laws, and was, therefore, at the heart of the respective disputes. (Doc. # 70 at 6.) This argument is not sound. *First,* there is the principle, stated above, that the merits of a privilege should be determined in generally applicable terms, not with specific reference to the facts of a particular case, or the particular claims raised.

*Second,* even if Defendants' reading of these cases is accurate,[19] the term "relevant" controls the discovery process without regard to degree or magnitude. Whether evidence

19. Defendants correctly note that in *Shadur,* it was alleged that the peer review process was being harnessed to serve anticompetitive ends, an allegation which led the Seventh Circuit to reject the peer review privilege. 664 F.2d at

1062–63. Similar facts at issue in *Pagano,* 145 F.R.D. at 686, *Pickett,* 1997 WL 394822, at *2, and *Swarthmore,* 1993 WL 517722, at *2, *3, met with the same result.

is highly relevant or just a little relevant, it is relevant nonetheless. Indeed, the *Price* court rejected an argument similar to that of Defendants herein. In that case, also an antitrust case brought by a physician against a hospital which had taken away some of his privileges, it was the defendant hospital which sought information from the plaintiff's medical peer review files, which were maintained at other hospitals in the area. 950 F.Supp. at 142. The peer review process at issue therein was not, contrary to the argument propounded by Defendants in this case, the vehicle used to violate antitrust laws. The *Price* defendants sought the information to support their defense that the plaintiff's ability to practice in the relevant geographic market had not been diminished. *Id.* at 143. Despite the existence of a state law barring the discovery of such information, and the unquestionable importance of confidentiality in the peer review process, *id.*, the District Court of Maryland found that the hospital's "need for discovery of the information from the medical peer review committee files and the paramount interest of the federal antitrust laws in preserving free competition outweigh the interests underlying the state medical peer review privilege." *Id.* at 143.

This Court agrees with the rationale of *Price*. Whether peer review information stands at the center of a controversy or to its side, as long as the information is relevant to Plaintiff's claim, it is discoverable, and the importance of fostering the free flow of information, which is the linchpin of fairness and truth in the judicial process, is paramount.

Furthermore, more than just the antitrust claim is at issue here. As Defendants themselves acknowledge, the peer review information may bear some relation to Plaintiff's state law claims for breach of contract and denial of due process. (Doc. # 70 at 6 n. 4.) While Defendants argue that Plaintiff's antitrust claim is being used merely as a subterfuge to gain access to information which would not be discoverable, under Ohio law, were he to have raised only state law claims in state court (which they implicitly suggest is how this dispute should have been handled), the rule in the Sixth Circuit is clear: the discovery rules of federal common law

apply to this entire case. *See Hancock,* 958 F.2d at 1373. Because the Court has already found that Plaintiff has stated a viable antitrust claim, he is entitled to discovery which may help develop that claim. If that discovery has an incidental benefit to his supplemental claims, that is simply the way of it. The fact that he would not be allowed to proceed in such fashion in the absence of his antitrust claim is, under Sixth Circuit precedent, inconsequential.

In sum, the Court finds that the federal common law has never adopted a physician peer review privilege, and that the great weight of authority, as well as "reason and experience," militate against doing so in this instance. The cases reaching the contrary conclusion are, simply stated, anomalies in the corpus of federal case law. As noted, *Armstrong* and *Morse* are wholly inapposite, while *Bredice* and *Laws* are of limited persuasive value, given the unusual nature of the historical role that the federal courts in the District of Columbia have played in resolving common law disputes. *Mewborn* and *Weekoty,* because of their heavy reliance on the rationale of *Bredice,* are also of limited value. For their part, *Cohn* and *St. Joseph's* are greatly outweighed by the balance of the cases, and even the *St. Joseph* court was not conclusive, reserving the option of ordering discovery were the plaintiff therein able to amend his pleadings to demonstrate how the information sought would be relevant. 113 F.R.D. at 680. In sum, the great weight of federal authority does not support Defendants' theory that a physician peer review privilege either has been or should be recognized as a matter of federal common law.

▮ As an alternative argument, Defendants contend that Plaintiff agreed, as a matter of contract, to the confidential nature of the peer review matters. They make this contention, notwithstanding the ironic fact that they do not share Plaintiff's belief that any such contract existed. (*See* Doc. # 70 at 7 n. 5.) Putting aside the obvious difficulty of asking the Court to enforce a contract which they do not believe exists, the argument is of no merit for other reasons, as well. The gist of this argument stems from Plaintiff's allegation, stated within in his claim for breach

of contract (Eighth Cause of Action), that Defendants breached the terms of their Credentials Policy Manual ("CPM"), a copy of which is attached to Plaintiff's Verified Complaint (Doc. # 1) at Exhibit 5, which he claims constitutes a contract between himself and Defendants. (*See* Verified Compl. ¶ 103.) If it is true, Defendants argue, that the CPM constitutes a contract, as Plaintiff would have the Court find,[20] then Plaintiff must be bound by all of its terms, including the provision relating to the confidentiality of certain information. The Court need not define the breadth of the CPM confidentiality provision (*see* CPM, Doc. # 1 at Ex. 5, Article V), because by its own terms such information is confidential only "to the extent permitted by law," and its dissemination is authorized "where required by law." (*See id.* § 5.2.1.) The right to discovery being a requirement of law, this argument gives the Court little to ponder.

■ For the reasons stated, the Court does not find Defendants' objections to Plaintiff's discovery requests at issue herein well taken. The only exception to this finding concerns some information which appears to have been requested by Plaintiff through informal means. Plaintiff submits that, in addition to his various requests for interrogatories and documents, made pursuant to Rules 33 and 34, respectively, he requested a number of other documents following the taking of several depositions, and said requests were also objected to on the basis of the peer review privilege. (Doc. # 70 at 7 & Ex. H.) Naturally, if Plaintiff has a reasonable basis for requesting this "other" information, he may do so, and, per the Court's ruling herein, the peer review privilege would not constitute a reasonable basis for objection by Defendants. However, Rule 34 is the formal mechanism by which documents are to be requested, and Plaintiff's Motion to Compel Discovery is only viable as to documents requested by that method. *See* Rule 37(a)(2)(B).

## II. *Conclusion*

For the reasons stated, to the extent Plaintiff's requests for interrogatories, served upon Defendants pursuant to Rule 33, and his requests for documents, served upon Defendants pursuant to Rule 34, have been objected to by Defendants on the basis of a peer review privilege, the Court finds that said objections must be overruled, as no such privilege is recognized by this Court. Subject to the caveat concerning the informal document requests, Plaintiff's Motion to Compel Discovery (Doc. # 69) is well taken, and is SUSTAINED. The Court hereby orders Defendants to disclose to Plaintiff answers to his interrogatories and the documents he has requested which heretofore have not been supplied on the basis of the physician peer review privilege.

Defendants are entitled to propose *reasonable* ameliorative conditions to be placed on the peer review information's disclosure. Of course, redactions which would impact the probative value of the information would not be permitted, but other measures taken to protect the identities of physicians and/or patients, whose names are not material to Plaintiff's specific needs, would be. *See, e.g., Wei*, 127 F.R.D. at 94 (ordering the disclosure of peer review information but allowing defendants to redact patient names and replace same with a coded numbering system, thus allowing plaintiff to obtain relevant evidence while respecting the confidentiality of patient identities). Naturally, Defendants may not take advantage of this option to prolong discovery. Accordingly, the parties shall be granted fourteen (14) days to reach agreement on reasonable redactions. Failure of either party to cooperate *in good faith* will be regarded by the Court as a failure to comply with this order, and will be dealt with accordingly.[21] Of course, Defendants may

---

**20.** The Court previously overruled Defendants' Motion to Dismiss (Doc. # 17) as to Plaintiff's claim that they breached the terms of the CPM, finding that he had stated a viable cause of action. (Doc. # 50 at 61.)

**21.** Though it probably need not be spoken, *good faith* in this instance requires that Defendants'

proposals for redacting names be reasonable. For instance, given that the Court has ordered them to disclose the names of any radiologists denied privileges at the Mercy Hospitals, per Plaintiff's Interrogatory No. 1 of his Second Set of Interrogatories (*see* Doc. # 69 at 5), it would not be reasonable to suggest that any such names

also move for a protective order pursuant to Rule 26(c) of the Federal Rules of Civil Procedure, to bar disclosure of any such discovery to persons not involved in this litigation.

Finally, Plaintiff's Motion to Defer Submission of Experts' Reports (Doc. # 76) is SUSTAINED. Counsel listed below will take note that a telephone conference call will be held, beginning at 8:40 a.m., on Thursday, September 26, for purposes of establishing a revised scheduling order, including a trial date and other dates leading to a resolution of this litigation, including a revised deadline for the filing of experts' reports.

be redacted. As to Plaintiff, *good faith* means that he cannot insist that Defendants' not redact the names of patients, as such are irrelevant to his requests.